UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON
CASE NO. 17-CV-005-WOB

BOBBY THOMAS                                                              PLAINTIFF

v.

COMMISSIONER OF SOCIAL SECURITY            DEFENDANT

**OPINION AND ORDER**

This is a Social Security appeal filed by plaintiff, through counsel, pursuant to 42 U.S.C. §§ 405(g). In accordance with the Court's standard procedures, both plaintiff and the Commissioner have filed motions for summary judgment based upon the administrative record. Docs. 12, 14. After considering the record and applicable law, the Court concludes that the Commissioner's motion will be granted and the plaintiff's will be denied.

**I. Factual and Procedural History**

Plaintiff Bobby Thomas filed an application for disability insurance benefits ("DIB") in September 2013. Tr. (Doc. 8-1) at 310-316. Plaintiff alleged a disability onset date of February 14, 2013 (Tr. 310)[1] due to rheumatory arthritis, unspecified "mental illness" and obesity. Tr. 440. Plaintiff was listed as being 5'7" tall and weighing 290 pounds. *Id.* After his claims were denied initially and upon reconsideration (Tr. 259-262; 264-270), plaintiff requested a hearing before an ALJ. Tr. 271-272. On September 14, 2015, an evidentiary hearing was held by ALJ Gloria York, at which plaintiff--represented by counsel—testified, as did William Harpool, a vocational expert ("VE"). Tr. 192-223.

---

[1] At some points in the record, the alleged disability onset date is listed as January 6, 2012. *See, e.g.,* Tr. 224. The ALJ noted the discrepancy and stated in her opinion that she would "consider all issues of disability from January 6, 2012." Tr. 171. Using either alleged onset date would not change the outcome of this action.

1

Plaintiff testified that he was born in 1981 and completed high school. Tr. 196-198. Plaintiff attributed his significant weight gain to daily intake of prednisone, a steroid. Tr. 197. He has not worked since February 14, 2013. Tr. 198. Plaintiff was employed as a material handler, which required him to help attach frames to bed springs. Tr. 198-199. Previously, he was a border bender, clipping borders onto bed springs. Tr. 199-200. From January 2012 to February 2013 plaintiff worked sporadically and sometimes was on sick or FMLA leave. Tr. 200-201. Plaintiff takes prescription medicines for his rheumatoid arthritis, which provide "some relief . . . ." Tr. 202. Plaintiff also suffers from obsessive compulsive disorder ("OCD"), for which he receives mental health treatment and takes prescription medications. Tr. 205-206.

Plaintiff lives with his wife and two young sons, but answered "[n]o, ma'am" when asked by the ALJ if he "take[s] care of the children[.]" Tr. 207. In addition, plaintiff performs no household chores, such as cooking or yard work. Tr. 208. Plaintiff's wife primarily does the family grocery shopping, but plaintiff does drive to a store a couple times per week. Tr. 209. When asked what he did all day, plaintiff stated that he "watch[es] TV and stuff." Tr. 210. Though it is difficult for him to do so, plaintiff tries to attend church weekly but engages in no other social activities because he "do[es]n't want to be around people" as he "look[s] goofy" and has low self-esteem. Tr. 211. Plaintiff estimated he could stand and walk about twenty minutes each and can sit about thirty minutes. Tr. 211. He can lift a gallon of milk and manipulate buttons and zippers, albeit with some difficulty at times. Tr. 212. Plaintiff sleeps poorly due to anxiety and pain. Tr. 213. Finally, Plaintiff "stay[s] so tired and do[es]n't feel like doing nothing" due to the rheumatoid arthritis. Tr. 215.

The VE then testified, classifying plaintiff's relevant past work as a material handler, which is an entry level position performed at the heavy level, and as a vending machine operator,

which also is an entry level position but is performed at the medium level.[2] Tr. 216. Tr. 48. The VE and the ALJ then engaged in the following colloquy:

> Q [by the ALJ] Mr. Harpool, I have a couple of hypothetical questions to ask of you . . . . First, I'd like you to assume a hypothetical individual of the Claimant's age. He was 31-years-old on the alleged onset of disability, 33-years-old at present and a younger individual. He has completed school through the 12th grade and he has past work in terms of skill and exertional level as you have described. I'd like you to assume that he can perform light and sedentary work, he can lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk six hours out of an eight-hour day. He can sit six hours out of an eight-hour day. I'd like you to assume that he can frequently handle, finger, and feel with both upper extremities. I'd like you to assume that he is limited to routine, repetitive tasks which require occasional interaction with supervisors and coworkers, no interaction with the general public, and he's limited to jobs that are not fast paced. Can he go back to any of his past work?
>
> A [by the VE] No.
>
> Q Are there unskilled jobs he can do?
>
> A Representative examples would be unskilled light inspecting. . . . Region, Kentucky about 3,300 . . .; nation about 200,000 . . . . There'd be unskilled light housekeeping and cleaning, office cleaner for night—at night, for example . . . . About 4,000 in the region . . . , national approximately 250,000 . . . . Hand packing hand working job just folding items or labeling items, that sort of thing . . . . About 3,200 in the region . . . . National approximately 195,000 . . . . Those are examples.
>
> Q And for hand packer [that] job is light also?
>
> A Light unskilled.
>
> Q Are there sedentary jobs such a person could do?

---

[2] For Social Security purposes, jobs are classified as sedentary, light, medium, heavy and very heavy. *See* 20 C.F.R. §404.1567 (2017 version). "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. §404.1567(d). Under subsection (c), medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." Light work, by contrast "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567(b).

> A Yes. Sedentary inspecting . . . . About 3,800 in the region . . . . Nation about 185,000 . . . . It would be final assembly type jobs. Sit down assembly, unskilled . . . . 3,200 in the region . . . . The nation about 165,000 . . . . Sedentary hand working typing type jobs again . . . . Roughly 3,000 in the region . . . . In the nation 150,000 . . . . I gave you a representative of that.
>
> Q All right. And the I guess two and a half or third hypothetical, I'd like you to assume we have the same individual that we talked about in terms of age, education, and past work. And those same limitations, either light or sedentary work, but the person would have to alternate position from sitting to standing and vice versa every 30 minutes. Does that make a difference in your answer?
>
> A It's only a brief change of position. It wouldn't affect sedentary very that [sic] much. Light jobs, maybe a 10% reduction.

Tr. 216-218. The VE then testified that a person with the aforementioned limitations who also could stand and walk less than two hours out of an eight-hour workday, sit less than two hours out of an eight-hour workday and who would be absent "close to more than four times a month" could not perform any work. Tr. 219. When asked by plaintiff's counsel, the VE testified that a person who had a marked inability to tolerate stress could not work. Tr. 220.

The ALJ issued her decision on October 15, 2015, using the familiar five-step sequential evaluation process.[3] Tr. 165-191. At Step 1 the ALJ found that plaintiff has not engaged in substantial gainful activity from the alleged onset date of January 6, 2012. Tr. 171. At Step 2, the ALJ found that plaintiff's rheumatoid arthritis, obesity and adjustment disorder with depression and anxiety were severe impairments. Tr. 171. At Step 3, the ALJ found that

---

[3] Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential review considers and answers five questions:
1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?
*See* 20 C.F.R. § 404.1520(a)(4).

plaintiff did not have an impairment, singly or in combination, which met one of the listed impairments. Tr. 172-173.

Next, as a necessary antecedent to Step 4, the ALJ found that plaintiff had the following residual functional capacity ("RFC"),[4] which largely tracks her hypotheticals to the VE. Specifically, the ALJ found plaintiff had the residual functional capacity:

> for a limited range of light and sedentary work. He can lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk six hours out of an eight hour day; sit six hours out of an eight hour day; frequently handle, finger, and feel with both upper extremities; and is limited to routine, repetitive tasks which require only occasional interaction with supervisors and co-workers and no interaction with the general public in a job which is not fast paced.

Tr. 174 (emphasis omitted). Given that RFC, at Step 4 the ALJ concluded that plaintiff could not perform his past relevant work. Tr. 182. At Step 5, the ALJ concluded that there are jobs that exist in significant numbers in the national economy at both the light and sedentary exertional levels which plaintiff could perform, such as, among others, inspector and hand packer. Tr. 183-184. Thus, the ALJ found that plaintiff was not disabled. Tr. 185.

Plaintiff promptly sought review of the ALJ's decision by the Appeals Council (Tr. 163-164) but in October 2016, the Appeals Council denied plaintiff's request for review. Tr. 1-4. ALJ York's decision thus became the Commissioner's final decision. Plaintiff then timely commenced this action. Doc. 1.

## II. Analysis

### A. Standards of Review

In a Social Security appeal, the Court is to determine whether the ALJ's non-disability finding is supported by substantial evidence and was made pursuant to proper legal standards.

---

[4] RFC "is the most plaintiff can do, not the least, after taking into consideration physical and mental limitations." *Branon v. Comm'r of Soc. Sec.*, 539 Fed. App'x 675, 677 n.3 (6th Cir. 2013).

5

42 U.S.C. §§ 405(g). *See also Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). Substantial evidence is "defined as more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation marks and citation omitted). If substantial evidence supports the ALJ's denial of benefits that finding must be affirmed, even if substantial evidence also exists which would support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit explained:

> The [Commissioner's] findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a zone of choice within which the [Commissioner] may proceed without interference from the courts. If the [Commissioner's] decision is supported by substantial evidence, a reviewing court *must* affirm.

*Id.* (quotation marks and citations omitted, emphasis added). *See also Rogers*, 486 F.3d at 241 ("In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). In determining whether substantial evidence supports the ALJ's decision, the court does "not try the case de novo, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

The plaintiff bears the burden of proof through the first four steps of the sequential process but the burden shifts to the Commissioner at Step 5. *Rabbers*, 582 F.3d at 652. To be entitled to benefits, a person must be disabled within the meaning of the Social Security Act, which means there must be sufficient evidence to show that, during the relevant time period, he suffered an impairment/combination of impairments, expected to last at least twelve months,

6

which left him unable to engage in substantial gainful activity. *Id.* at 651-652 (citing 42 U.S.C. §§ 423(d)(1)(A)).

### B. Deficient Motion

Plaintiff's motion is seriously deficient in four main respects. First, it fails to comply with subsection 3(b) of the Court's standing order in Social Security Cases, General Order 13-7, which provides that:

> In order to assist the Court in understanding the plaintiff's claims, any motion for summary judgment or judgment on the pleadings **SHALL** include a statement of the legal arguments presented at the beginning of the motion. The statement shall set forth the plaintiff's arguments in a numbered list. [For example: (1) The ALJ improperly discounted the opinion of the treating physician.] The Court will consider only the arguments listed and will not formulate arguments on the Parties' behalf. Failure to submit such a statement may constitute grounds for denial of the motion.

Doc. 9 at 3 (brackets and emphasis original). Despite that clear, mandatory language plaintiff's motion inexplicably does not contain "a statement of the legal arguments presented at the beginning of the motion." Instead, plaintiff's motion begins with a lengthy "statement of the case" followed by a "statement of facts"—each of which, despite their titles, actually is replete with perfunctory arguments (a related problem which will be discussed later herein). Finally, on page eight of the twelve-page motion, plaintiff lists one lone issue: "WHETHER THE COMMISSIONER'S DECISION TO DENY THE PLAINTIFF BENEFITS IS SUPPORTED BY THE [SIC] SUBSTANTIAL EVIDENCE IN THE RECORD AND THE REVIEWING CASE LAW." Doc. 12-1 at 8 (emphasis omitted). Standing alone, the failure to submit the statement of issues at the beginning of the motion is grounds for summarily denying it.

Second, the "issue" belatedly listed by plaintiff is wildly nonspecific. There is no explanation as to what allegedly disabling conditions plaintiff suffers from, what evidence of record supports a disability finding/what evidence the ALJ failed to consider. In other words,

7

the "issue" listed is really only a recitation of the basic question inherent in all Social Security cases: is the ALJ's decision supported by substantial evidence?

Third, the "facts" and "statement of the case" sections of plaintiff's supporting memorandum contain a host of fleeing, woefully underdeveloped arguments. For example, the very opening paragraph of the motion contends, with no elaboration, such things like: a) the ALJ failed to follow *Hurst v. Secretary of H.H.S.*, 753 F.2d 517 (6th Cir. 1985); b) the ALJ failed to afford proper weight to the findings of Dr. Jeffrey Neal, plaintiff's treating rheumatologist; and c) the ALJ erred by not finding that plaintiff's condition meets or exceeds Listing 14.09. *See* Doc. 12-1 at 1-2. Shortly thereafter, plaintiff argues that the ALJ failed to consider the record as a whole and failed to understand that "pain alone may establish a disability for purposes of the Act." *Id.* at 4. Plaintiff then glancingly argues that the ALJ cited to medical records which contradict her conclusions (*id.* at 5) and the VE testified that plaintiff's manipulative deficits in his hands precludes him from working. *Id.* Plaintiff then asserts the ALJ erred by not accepting a provider's evaluation which showed plaintiff could not work. *Id.* at 6. Plaintiff then veers to contending the ALJ failed to follow the findings of Dr. Jayalakshmi Pampati, "the other treating rheumatologist," and then veers again to argue the ALJ engaged in a "misinformed attempt to minimize the medical findings and limitations . . . ." *Id.* Plaintiff then argues that the ALJ failed to give proper weight to treating physicians instead of nontreating providers. *Id.* at 7. Next, plaintiff argues the ALJ failed to afford proper weight to the conclusions of John Jones and gave too much weight to the findings of consultative psychologist Emily Skaggs. *Id.* at 7-8. Colorfully, plaintiff ends the "statement of the facts" section of his motion by contending the ALJ engaged in "sit and squirm" decision-making. *Id.* at 8. All of the aforementioned

"arguments" are little more than a sentence or two long and are set forth in the motion well before the sole denominated issue is belatedly listed.

As this Court has explained before, "perfunctory and undeveloped" arguments are deemed waived. *See, e.g., Lete v. Colvin*, 2015 WL 4548736, at *6 (E.D. Ky. July 28, 2015). Or, as the Sixth Circuit has memorably held "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-294 (1st Cir. 1995)).

Fourth, though there are sporadic exceptions, many of plaintiff's arguments do not contain a corresponding citation to the record showing where the Court may find the relevant background information, such as the conclusions or findings of a provider. This problem (along with the aforementioned failure to adequately explain/discuss issues) is ably exemplified by quoting in full the opening, run-on paragraph of the motion:

> More than thirty(30) [sic] years ago in Hurst v. Secretary of H.H.S., 753 F.2d 517 (6th Cir. 1985), the Sixth Circuit discussed the criteria for diagnosing rheumatoid arthritis at length. Thereafter the court held that the diagnosis of a treating physician based upon generally recognized diagnostic techniques should have been accepted by the Secretary despite the Secretary's claim that there was an absence of sufficient "objective" findings for an award of benefits. We [sic] believe that this Court faces a similar scenario here in Mr. Thomas' case where the Commissioner first claimed that it gave the greatest weight to [the opinion of] Mr. Thomas' treating rheumatologist, Dr. Jeffrey Neal, M.D. that Mr. Thomas suffers from rheumatoid arthritis but then refused to give credence to the rest of this doctor's findings who had not only diagnosed that [sic] the rheumatoid arthritis but also noted despite active and aggressive treatment of more than three (3) years that Mr. Thomas suffers functional difficulties even with his day-to-day activities, has experienced four (4) severe flare-ups in the last eighteen (18) months despite being on long-term steroid therapy: [sic] that Plaintiff's active rheumatoid arthritis is still not under control; that he suffers from a history of joint pain; that there is a documented history of joint swelling; that there is a documented history of joint tenderness; that he suffers morning stiffness; that

> there is a documented synovial inflammation; that there is documented limitation of motion in joints, that there is documented positive serum rheumatoid factor; that Plaintiff experiences and inability to ambulate effectively; , [sic] and that Plaintiff suffers from inability to perform fine and gross movements effectively. In addition, Dr. Neal also noted significant fatigue and malaise. These medical findings from Dr, [sic] Neal, the Plaintiff's treating rheumatologist, whom the Commissioner gave the greatest weight(T.R. 181) [sic], meets or equals the requirements of Listing 14.09 found in the Listing of Impairments and which the ALJ herself provides at the outset of the Plaintiff's disability analysis (T.R. 172) should have sufficient [sic] to find the Plaintiff disabled and to award him his deserved benefits. Yet the ALJ fails to grasp the consequences of these findings.

Doc. 12-1 at 1-2.

In addition to hampering the Court's ability to find the relevant materials in the thousand-plus page record, plaintiff's lack of adequate citations to the record also is a second, independent violation of the Court's general order. Subsection 3(c) of the general order provides as follows:

> The parties shall provide the Court with specific page citations to the administrative record to support their arguments. The Court will not undertake an open-ended review of the entirety of the administrative record to find support for the parties' arguments. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). Failure to provide specific citations to the record may constitute grounds for denial of the motion.

Doc. 9 at 3-4.

Any of those four main deficiencies in plaintiff's motion would be sufficient for the Court to summarily deny it. Nonetheless, to minimize the harm plaintiff would suffer due to his counsel's briefing inadequacies, the Court *leniently* will not summarily deny the motion. However, the Court also will not analyze each perfunctory argument or "engage in a fishing expedition for evidence to support [plaintiff's] broad assertions." *Durham v. Astrue*, 2010 WL 672136, at *7 (E.D. Ky. Feb. 22, 2010). Instead, the Court will briefly discuss plaintiff's sole denominated argument: is there substantial evidence to support the ALJ's decision? The remainder of plaintiff's tangential, scattershot arguments are deemed waived because they are too perfunctory and/or grossly fail to comply with General Order 13-7.

## C. The ALJ's Decision Is Supported By Substantial Evidence

Plaintiff's "argument" section is not quite two substantive pages long, the majority of which consists of a recitation of various standards of review. Indeed, the entirety of plaintiff's actual merits argument is the final two paragraphs of his motion:

> While it is appropriate for an ALJ to assess the credibility of the Plaintiff, substituting her arbitrary opinion of Mr. Thomas' disability over sound medical and psychological judgments in the record is not permissible. Blankenship v. Secretary of H.H.S., 874 F.2d 1116, 1121 (6th Cir. 1989); Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985); King v. Heckler, supra; Martin v. Heckler, 735 F.2d 431 (6th Cir. 1984).
> The treating medical physicians on whom the ALJ gave greatest weight disable Mr. Thomas as the result of his active rheumatoid arthritis and the consequent limitations it has placed on the Plaintiff. In addition, the Commissioner's own psychologist, whom the ALJ chose to give great weight, also noted significant mental impairments which would additionally prevent the Plaintiff from resuming any gainful work (See T.R. 220).

Doc. 12-1 at 10.[5]

As the Court construes it, plaintiff's core argument is that the ALJ erred in determining that plaintiff retained the ability to perform a modified range of light and sedentary work (i.e., in formulating plaintiff's RFC) because various providers allegedly concluded plaintiff was incapable of engaging in substantial gainful activity. The Court agrees that there is substantial evidence from which an ALJ could have found plaintiff to be disabled; however, the ALJ's contrary determination is also supported by substantial evidence, as will be shown in the following brief discussion of the findings of various providers.

---

[5] The Court is left to speculate where in the 1,000+ page record certain unnamed providers opined that plaintiff was not capable of engaging in substantial gainful activity. Moreover, the case found at 735 F.2d 431 is *Middlebrooks v. Smith*, a postconviction opinion from the Eleventh Circuit—not *Martin v. Heckler*. Indeed, the Court did not independently locate a Sixth Circuit case styled *Martin v. Heckler*. Moreover, page 220 of the administrative record, which plaintiff cites to support his argument regarding what "the Commissioner's own psychologist" allegedly concluded, contains the testimony of the VE, not a psychological report. Such inattention to detail is frustratingly common in plaintiff's motion.

### 1. Dr. Neal

On October 17, 2013, Dr. Jeffrey Neal, plaintiff's treating rheumatologist, wrote a "To Whom It May Concern" letter which stated that "[w]e have not gained full control of his [rheumatoid arthritis] disease. It is entirely possible that he could miss two or more days of work in a six week period. He feels the disease has limited his ability to do physical activities." Tr. 704. As the ALJ aptly noted, however, Dr. Neal's statement about it being "entirely possible" plaintiff would miss two or more days of work every six weeks is vague. Moreover, the statement about plaintiff subjectively believing his ability to perform physical activities has been negatively impacted is of little value as: a) a recitation of a claimant's subjective beliefs is not akin to a provider offering a professional opinion on a claimant's ability to work; and b) the standard is whether plaintiff can engage in substantial gainful activity, not whether he merely has a more limited ability to engage in physical activities. Likewise, Dr. Neal checking a box on a short-term disability form indicating plaintiff would have "episodic flare-ups" which would "periodically" prevent him from performing his job functions (Tr. 530) is of no real value to plaintiff as the ALJ readily found that plaintiff could not perform his past job functions. The question is whether there are any other jobs which plaintiff could perform, not whether he could perform his prior work. After all, a person with a diminished ability to engage in physical activities could still perform other less physically demanding jobs, which is precisely what the ALJ concluded.

No one disputes that plaintiff has severe impairments, such as rheumatoid arthritis. However, as the United States District Court for the Western District of Tennessee cogently noted in a recent opinion, "[t]he mere fact that Plaintiff has a diagnosis or diagnoses does not mean that she has disabling limitations. It is well settled that a diagnosis, in and of itself, says

nothing about the severity of the condition. Instead, the ALJ must consider the actual work-related impact of those diagnoses." *Petty v. Comm'r of Soc. Sec.*, 2017 WL 396791, at *3 (W.D. Tenn. Jan. 30, 2017) (quotation marks, footnote and citations omitted). In other words, having rheumatoid arthritis does not entitle plaintiff to benefits.

As the ALJ noted, Dr. Neal's office notes contain many indications that plaintiff's arthritis was not completely disabling. For example, on July 24, 2013 Dr. Neal noted plaintiff had swollen fingers but a "full range of motion of the shoulders, elbows, wrists, and hands without notable deformities, soft tissue swelling, synovitis, or atrophy . . . . Hips have good flexion and internal and external rotation. Knees have no palpable effusions. There is full extension and full flexion of the knees without pain. Ankles have no soft tissue swelling, synovitis, or major deformities."[6] Tr. 562. Dr. Neal made similar findings on many other occasions. *See* Tr. 564, 566, 568, 569, 571, 574, 575, 577. Moreover, in March 2012 Dr. Neal interpreted x-rays of plaintiff's hands (Tr. 596) and feet (Tr. 597) to be normal. Similarly, in March 2014 Dr. Neal noted that an x-ray of plaintiff's feet were normal and he had only "mild subluxation [incomplete or partial dislocation] of the first CMC [carpometacarpal] joint" in his hands. Tr. 733-734. Thus, in July 2013 Dr. Neal characterized plaintiff's rheumatoid arthritis as being "[l]ow disease but persistent disease activity." Tr. 562. A low-grade disease with full range of motion in most joints and no synovitis supports the ALJ's conclusion that plaintiff was not disabled.

---

[6] Synovitis is defined as "inflammation of a synovial membrane usually with pain and swelling of the joint[.]" https://www.merriam-webster.com/dictionary/synovitis#medicalDictionary (last visited August 23, 2017). A synovial membrane is "the dense connective-tissue membrane that secretes synovial fluid and that lines the ligamentous surfaces of joint capsules, tendon sheaths where free movement is necessary, and bursae[.]" https://www.merriam-webster.com/medical/synovial%20membrane (last visited August 23, 2017).

## 2. Dr. Pampati

Plaintiff also saw Dr. Jayalakshmi Pampati for arthritis. Similar to Dr. Neal's observations, Dr. Pampati noted in August 2013 that plaintiff had "no evidence of acute or active synovitis involving the shoulders, elbows, wrists, MCP [metacarpophalangeal], PIP [proximal interphalangeal] joints, knees, ankle and feet. There was minimal chronic changes with small amount of synovial thickening in the left knee. Second and third MCP joint also revealed minimal synovial thickening. Bilateral ankles revealed mild swelling with no evidence of active synovitis." Tr. 606. Dr. Pampati thus concluded that plaintiff "does not appeared [sic] to have any evidence of active disease on methotrexate."[7] *Id.* Dr. Pampati opined that if plaintiff did have rheumatoid arthritis he "will be unable to perform work at a factory which involves sitting, standing and repetitive actions with his hands and feet." *Id.* Dr. Pampati made similar findings regarding plaintiff having no acute or active synovitis in October 2013 (Tr. 713) and January 2014. Tr. 711.

The Court is cognizant that in October 2013 Dr. Pampati wrote a "to whom it may concern" letter opining that plaintiff is "[t]otally incapacitated for a period of permanently for his present occupation" due to rheumatoid arthritis "which causes flare of joint pain in multiple joints with intermittent disabling fatigue[.] This may interfere with a 5 day/40hr work week." Tr. 723. However, again, the question is not whether plaintiff can return to his former factory job(s)—the question is whether he is capable of performing any substantial gainful activity. Moreover, Dr. Pampati's opinion is vague as simply saying a condition "may" interfere with an ability to engage in a forty-hour workweek is not a definitive medical conclusion. In addition,

---

[7] Methotrexate is "a toxic drug $C_{20}H_{22}N_8O_5$ that is an analog of folic acid and is used to treat certain cancers, severe psoriasis, and rheumatoid arthritis—called also *amethopterin*[.]" https://www.merriam-webster.com/dictionary/methotrexate#medicalDictionary (last visited August 23, 2017).

Dr. Pamapti's findings show that plaintiff had no "active disease" when he took methotrexate, which supports the ALJ's conclusion that the arthritis was largely controlled and not disabling.

### 3. Nurse Williams

Elizabeth Williams, APRN, was plaintiff's main primary care provider. Her notes are not as detailed as those of Drs. Neal and Pampati, but she did note mild edema in plaintiff's right hand and stiffness in his wrist joints on several occasions. *See, e.g.,* Tr. 617, 620, 659, 673. Nurse Williams' records also refer to plaintiff feeling depressed, anxious and stressed. *See, e.g.,* Tr. 619.

In August 2013 she opined plaintiff could only carry ten pounds occasionally, stand and/or walk less than two hours in an eight-hour workday and sit less than six hours in an eight-hour workday. Tr. 598-599. She also completed another undated medical statement in which she opined that plaintiff could work zero hours per day and would be absent more than four days per month. Tr. 816. Finally, even though there is no evidence that she had plaintiff undergo formal psychological testing, she completed a mental health assessment in May 2014 in which she rated plaintiff as having "poor or none" capabilities in all fifteen categories listed on the form, such as ability to maintain personal appearance, understand/remember/carry out simple job instructions and maintain attention/concentration. Tr. 814-815.

The ALJ was also permitted to discount the conclusions of Nurse Williams. As the ALJ aptly noted, "[h]er extreme limitations are simply not supported by the objective medical findings." Tr. 182. *See, e.g., Helm v. Comm'r of Soc. Sec.*, 405 Fed. App'x 997, 1001 (6th Cir. 2011) ("The ALJ could conclude that the extreme functional limitations assessed by Dr. Cheng were unsupported by objective medical findings and were inconsistent with the record as a

whole."). The limitations imposed by Nurse Williams far exceed anything reflected in her office notes or those of Drs. Neal and Pampati.

### 4. John Jones

John Jones, LCWS, also saw plaintiff regarding his mental health issues from 2013-2015. Mr. Jones' notes generally reflect that plaintiff had good hygiene, was oriented to person/place/time, had clear speech and thought, was attentive and understood the nature of his problems and the consequences of his behavior. Tr. 623.

Mr. Jones completed a mental health capacity assessment of plaintiff in September 2013 and again in April 2014. Both times, he rated plaintiff as having a poor ability in some areas, such as carrying out detailed instructions, a fair ability in some areas, such as maintaining concentration for extended periods, and a good ability in some areas, such as carrying out short and simple instructions. Tr. 755-759. Remarkably, in the April 2014 form, Mr. Jones noted that plaintiff has "problems with memory and comprehension" (Tr. 759) even though his office notes from March 25, 2014 reported plaintiff had "No Memory Impairment[.]" Tr. 749. Mr. Jones opined plaintiff would miss more than four days of work per month. Tr. 759. The ALJ gave "little weight" to Jones's opinions because his "mental capacity forms set forth extreme limitations that are not consistent with the overall record." Tr. 182. That conclusion is supported by substantial evidence, given the discrepancy between Jones's notes regarding plaintiff's attentiveness, memory and clarity of thought and Jones' much more dire conclusions on the capacity forms.

### 5. Dr. Emily Skaggs

Emily Skaggs, Psy.D., performed a consultative psychological exam of plaintiff in March 2014. Plaintiff was alert, cooperative and "[n]o deficits were noted in his memory for details."

16

Tr. 739. Plaintiff's "fund of knowledge appeared below average" and "[h]is overall intellectual ability was judged to be in the low average range." *Id.* Dr. Skaggs diagnosed plaintiff with adjustment disorder with mixed depression and anxiety, obsessive-compulsive disorder features and assigned him a GAF of 55.[8] Tr. 740. Plaintiff had moderate[9] limitations to things like understanding and carrying out instructions to perform simple tasks and sustaining attention to perform simple tasks and marked[10] impairment in tolerating stress and the pressure of daily employment. Tr. 740-741.

The ALJ was clearly permitted to afford great weight to Dr. Skaggs' findings. However, Dr. Skaggs found that plaintiff had some limitations but her conclusions do not support a firm determination that plaintiff is incapable of engaging in substantial gainful activity. Instead, Dr. Skaggs' conclusions as a whole indicate that plaintiff has difficulties in some areas, but those categorical findings explicitly are not work-preclusive, as the ALJ noted. Tr. 182. For example, Dr. Skaggs did not rate plaintiff as having extreme limitations in any areas.[11]

Finally, the ALJ did not err by discounting the subjective complaints of plaintiff. Simply put, the ALJ was not obligated to give total credence to all of plaintiff' subjective complaints in

---

[8] A Global Assessment Function ("GAF") score of "51-60 indicates moderate symptoms or moderate difficulty in social or occupational functioning, rather than the more serious symptoms or difficulty in functioning suggested by a score in the 40s." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511 (6th Cir. 2006). Although a tool to "allow[] a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning[,]" a GAF score is not "raw medical data" which directly correlates to a person's ability to engage in substantial gainful activity. *Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007).

[9] Moderate was somewhat redundantly defined in Dr. Skaggs' report as "[t]here is moderate limitation in this area, but the individual is still able to function satisfactorily." Tr. 740.

[10] Marked was defined in Dr. Skaggs' report as "[t]here is serious limitation in this area. The ability to function is severely limited, but not precluded." Tr. 740.

[11] Extreme was defined in Dr. Skaggs' report as "[t]here is major limitation in this area. There is no useful ability to function in this area." Tr. 740.

17

the light of conflicting medical/psychological evidence. *See, e.g., Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("In evaluating the claimant's subjective complaints of pain an administrative law judge may properly consider the claimant's credibility, and we accord great deference to that credibility determination. The claimant's credibility may be properly discounted to a certain degree ... where an [administrative law judge] finds contradictions among the medical reports, claimant's testimony, and other evidence.") (citations and paragraph break omitted).

In sum, the record contains findings and opinions which could have justified a finding that plaintiff is disabled. However, the record also contained findings and opinions which support the ALJ's conclusion that plaintiff is not disabled. Thus, regardless of how the Court would have initially decided the matter, this case falls squarely within the "zone of choice within which the [Commissioner] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035.

**III. Order**

For the foregoing reasons, **IT IS ORDERED**:

1. Plaintiff's motion for summary judgment (doc. 12) is **DENIED**;

2. The Commissioner's motion for summary judgment (doc. 14) is **GRANTED**; and

3. This case is hereby stricken from the Court's docket.

This, the 28th day of August, 2017.



Signed By:
*William O. Bertelsman* WOB
United States District Judge